UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

MIKE AND LINDA MATTEI,            :

        Plaintiffs        :        CIVIL ACTION NO. 3:19-2196

    v.                :        (JUDGE MANNION)

THE TUTHILL CORPORATION           :
d/b/a BLUE MOUNTAIN RESORT
                                    :

        Defendant         :

## MEMORANDUM

Presently before the court is Defendant's motion for summary judgment. (Docs. 38–40). Plaintiffs filed a brief in opposition, (Doc. 41), and Defendant filed a reply brief, (Doc. 42). Plaintiffs Mr. and Mrs. Mattei bring this suit against Defendant for injuries sustained by Mr. Mattei while skiing one day in 2018 at Defendant's Blue Mountain Resort in Pennsylvania. This case raises questions regarding the inherent risks of downhill skiing, the enforceability of releases on lift tickets, and the legal sufficiency of the facts alleged by Plaintiffs of Defendant's gross negligence and recklessness. As explained below, there are genuine disputes of material fact relevant to each question; therefore, the court will **DENY** Defendant's motion.

**I.   FACTUAL BACKGROUND**

With respect to this motion for summary judgment, the essential, undisputed facts are relatively straightforward.[1] Plaintiff Mike Mattei, his wife, Plaintiff Linda Mattei, and three friends went skiing on January 3, 2018, at Defendant's Blue Mountain Resort in Pennsylvania. Mr. Mattei was an experienced skier of 40 years who had skied several Pocono Mountains and taught beginner skiing lessons. The parties dispute whether Mr. Mattei purchased a lift ticket on the day of the incident, but he and his group ultimately entered the resort and started skiing at 10:00 a.m. The group completed four runs—mostly on expert category slopes—then hopped back on the lift and headed to the top of the "Sidewinder" trail. That trail starts near the top of the mountain and continues down to a crossover area where the skier can veer left to transfer to the second half of the abutting "Lazy Mile" trail or stay right to continue down the "Lower Sidewinder" trail. The parties dispute the extent of the trail grooming in and around this crossover area on the day of the incident; Defendant points to testimony that the grooming around the crossover area guided skiers down toward Lower Sidewinder,

---

[1] The factual background of this Memorandum is taken from the parties' submissions to the extent they are consistent with the evidence in the record. (Docs. 38–42).

while Plaintiffs point to testimony that the trail was groomed all the way across the crossover area to Lazy Mile.

In any event, Mr. Mattei headed down the Sidewinder first in his group, as was his custom. Once he approached the crossover area, Mr. Mattei veered left toward Lazy Mile. What happened next comes from the eyewitness testimony of two other Michaels who viewed Mike Mattei's misfortune—Michael Colon, an employee of Defendant, and Michael Gavaghan, a guest who was snowboarding on the Lazy Mile trial—since, because of his injuries, Mr. Mattei has no recollection of the events that day; and before his fall he had skied far enough ahead of the other members in his group that none of them saw the incident. Gavaghan was skiing down Lazy Mile when he saw Mr. Mattei coming down "pretty quick" and "hugging" the left side of the Sidewinder trail approaching the crossover area. Gavaghan says Mr. Mattei then went over somewhat of a "ditch area" and the front of his skis struck the up slope of the ditch causing him to faceplant and slide approximately fifteen feet into Lazy Mile. Colon saw the incident as he was riding in a chair lift above the Sidewinder-Lazy Mile crossover. He similarly observed Mr. Mattei coming down the left side into the crossover area, which Colon testified was off the groomed surface.

In short, the parties do not dispute that Mr. Mattei was coming down Sidewinder, hugged the left side of the crossover area towards Lazy Mile, and fell after going over a sudden change in elevation in the slope—call it a "ditch" or a "drop-off" of approximately five feet. Mr. Mattei was ultimately life flighted to Lehigh Valley Medical Center after the fall. He sustained several serious injuries for which he brings this suit.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F.Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). The court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-

movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

Finally, the court is sitting in diversity resolving a matter of state law in this case; thus, "[i]nasmuch as Pennsylvania law governs this action[,] we treat Pennsylvania Supreme Court opinions as binding precedent and Pennsylvania Superior Court opinions as persuasive precedent." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 107 n.2 (3d Cir. 2009).

## III.  DISCUSSION

### A. Inherent risks of downhill skiing

The first issue raised by Defendant's motion for summary judgment is whether the Pennsylvania Skier's Responsibility Act (PSRA) bars Plaintiffs' negligence claim. That act acknowledges "there are inherent risks in the sport of downhill skiing," 42 PA. CONS. STAT. §7102(c)(1), and, for that reason, "preserves assumption of risk as a defense to negligence suits stemming from downhill skiing injuries," *Smith v. Seven Springs Farm, Inc.*, 716 F.2d 1002, 1007 (3d Cir. 1983). The Pennsylvania Supreme Court explained the PSRA establishes a "no-duty" rule for skiing injuries, relieving

ski resorts of the "duty to protect skiers from risks that are common, frequent, and expected, and thus inherent to the sport." *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1186 (Pa. 2010) (citation omitted). Application of the no-duty rule is determined by a two-step test: (1) the plaintiff was "engaged in the sport of downhill skiing at the time of her injury"; and (2) the risk of the injury at issue "is one of the 'inherent risks' of downhill skiing." *Hughes v. Seven Springs Farm, Inc.*, 762 A.2d 339, 344 (Pa. 2000). When both prongs are met, summary judgment is warranted in favor of the ski resort "because, as a matter of law, [the plaintiff] cannot recover for her injuries." *Id.* It is undisputed that Mr. Mattei was downhill skiing at the time of his injury, so we proceed to the second prong of the *Hughes* test. Regarding that prong the Third Circuit has explained:

> The PSRA "is unusual in its brevity and failure to give any definition of an 'inherent' risk of skiing," *Chepkevich*, 2 A.3d at 1188 n.15, so we turn to caselaw for guidance. The Pennsylvania Supreme Court has identified collisions with other skiers, "snow and ice, elevation, contour, speed and weather conditions," *Hughes*, 762 A.2d at 344, and falling from a ski lift, *Chepkevich*, 2 A.3d at 1188, as inherent risks. It has also instructed other courts to adopt "a practical and logical interpretation of what risks are inherent to the sport," *id.* at 1187–88, and explained that invocation of the PSRA does not require proof that the injured skier assumed the "specific risk" that caused injury—only that the injury arose from a "general risk" inherent to the sport, *id.* at 1188.

*Vu v. Ski Liberty Operating Corp.*, 763 F. App'x 178, 180–81 (3d Cir. 2019).

To that list of inherent risks of downhill skiing we can add:

- 7 -

- "a failure by staff of a ski resort to (1) set netting in all spots where it might prove necessary, and (2) fix a race course in a way that minimizes the potential for the competitors to lose control," *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 269 (3d Cir. 2008);

- "soft, loose snow outside the chemically treated part of the course," *id.* (quotation marks omitted);

- "skiing off trail and suffering from the change of elevation between the trail and surrounding terrain," *Vu v. Ski Liberty Operating Corp.*, 295 F.Supp.3d 503, 510 (M.D. Pa. 2018), *aff'd Vu*, 763 F. App'x at 181;

- "[a]ccidentally striking an object while skiing down a slope," *Cole v. Camelback Mountain Ski Resort*, No. 3:16-CV-1959, 2017 WL 4621786, at *4 (M.D. Pa. Oct. 16, 2017); and

- "encountering [four to six-inch] wheel ruts on a ski slope created by an ATV operated by an employee of defendants," *Kibler v. Blue Knob Recreation, Inc.*, 2018 PA Super 89, 184 A.3d 974, 980 (2018).

While none of the above risks that courts have held to be inherent to downhill skiing are directly on point, they nonetheless inform the analysis in this case. A review of those decisions reveals at least two material facts for which there is a genuine dispute on this record, precluding summary judgment.

The first material fact for which there is a genuine dispute is whether Mr. Mattei was skiing on or off trail when the incident occurred. There is competent record evidence going both ways on this issue, which shows the dispute is genuine. Defendant's evidence—including Colon's deposition testimony, a trail map, and a photograph of the crossover area—supports

the propositions that the Sidewinder trail at the point of the crossover area is groomed to direct skiers to the right leading down Lower Sidewinder, and, by veering left toward Lazy Mile, Mr. Mattei was skiing off trail when he fell and was injured. (Doc. 40, ¶¶17, 26). Plaintiffs' evidence—including Robert Heil's deposition, an expert report, and photographs therein—supports the proposition that Mr. Mattei was skiing on the groomed trail when the incident occurred. (Doc. 41-7 at 3). Case law in Pennsylvania and in this circuit demonstrates that the on-trail, off-trail distinction is material to the determination of whether the risk was inherent to downhill skiing.[2] For example, in *Vu*, 295 F. Supp. 3d at 509, the plaintiff moved to avoid a collision with a snowboarder and skied over the drop-off at the edge of the trail and into a pile of rocks. In considering whether "skiing over the edge of the trail and encountering a three to four-foot drop-off into a pile of rocks is an inherent risk of downhill skiing," *id.*, the court distinguished "the drop-off at the edge of the trail [from] a ditch or hole in the slope itself," *id.* at 510, and held that "the risk of skiing off trail and suffering from the change of elevation between the trail and surrounding terrain is an inherent risk of downhill

---

[2] Defendant's phrasing of the "general risk" involved in this case also displays the materiality of the on-trail, off-trail distinction: "[whether] the risk of falling [is] an inherent risk of *skiing off the groomed surface* at a high rate of speed into a merge while going airborne." (Doc. 39 at 8) (emphasis added).

skiing," *id*. See also *Bjorgung*, 550 F.3d at 269 (finding skiing off trail during a race into the woods and hitting a tree is an inherent risk of downhill skiing). While a "three to four-foot drop-off" encountered off trail, *id.*, may be an inherent risk of downhill skiing, it cannot be said as a matter of law here that a similar, several-foot drop-off on the trail is also an inherent risk.

The second material fact for which there is a genuine dispute here is whether the five-foot ditch was perceptible to a skier. There is conflicting evidence in the record regarding whether a skier could appreciate the risk of skiing over the area with the five-foot ditch where Mr. Mattei was injured.[3] The court words the issue of fact carefully to state "a skier" as opposed to "Mr. Mattei" because, as Defendant correctly points out, according to the Pennsylvania Supreme Court, Mr. Mattei's subjective appreciation of the risk posed by the ditch is not relevant to the objective inquiry required under the PSRA. But Defendant goes beyond the controlling case law in arguing that the perceptibility of the risk involved in this case is entirely irrelevant. Instead,

---

[3] For example, Mr. Colon testified that the snow groomer, while grooming Sidewinder, would create a line of chunky snow along the edge of the groomed surfaced of the trail, which suggests the danger of skiing over that area could have been appreciated by a skier. (Doc. 40, ¶27). On the other hand, Plaintiffs' witness Mr. Heil testified that the trail was groomed all the way across to Lazy Mile where Mr. Mattei skied, and Plaintiffs point to testimony from Mr. Gavaghan that suggests a skier could not have seen the ditch from coming down the Sidewinder trail. (Doc. 41-7 at 5, 7).

the cases make plain that whether a certain danger is perceptible to skiers generally is a relevant question when deciding whether that risk is inherent to downhill skiing. For example, in *Vu*, in affirming the trial court decision that the risk was inherent, the Third Circuit cited testimony from the plaintiff's daughter that the edge of the trail could be discerned with no difficulty and testimony from a witness that "he was able to 'easily' distinguish the skiable terrain from off trail." 763 F. App'x at 180. Similarly, in *Kozlowski v. JFBB Ski Areas, Inc.*, 427 F.Supp.3d 559, 566 (M.D. Pa. 2019), the court found the disputed fact of whether the edge of the trail was easily discernable to a skier precluded summary judgment.

Moreover, contrary to Defendant's suggestion, *Chepkevich* does not preclude this finding. As quoted above, *Chepkevich* cautioned courts that the relevant inquiry under the PSRA asks whether the "general risk" faced by the plaintiff is inherent to downhill skiing, not the "specific risk." 2 A.3d at 1188. So, in *Chepkevich*, the plaintiff was said to assume the inherent risk of falling off a chairlift generally—the specific risk of the chairlift operator stopping the chairlift at the plaintiff's request the first time but not the second time was not relevant. *Id.* Here, asking whether a hidden, on-trail, five-foot drop is an inherent risk of downhill skiing is to inquire of the "general risk" involved in Mr. Mattei's injury, in accord with *Chepkevich*. In addition, while boarding a

chairlift is "simply how this aspect of the sport is done," *id*. at 1187, the same cannot be said of skiing over hidden ditches of several feet on the groomed trail as the record here supports when viewed in the light most favorable to the plaintiffs. Instead, there are genuine disputes of material facts precluding summary judgment on the ground that the "no-duty" rule shields Defendant from liability here.

In sum, reading the disputed facts in the light most favorable to Plaintiffs, there is evidence that Mr. Mattei was on-trail, merging from Sidewinder to Lazy Mile on an apparently groomed section of the trail, and flew off a concealed drop of several feet. The question, then, under the PSRA is whether falling from a hidden drop-off of several feet while on-trail is an inherent risk of downhill skiing. Defendant has not met its burden to show that it is; thus, summary judgment is not proper on this ground.

**B. Exculpatory release**

The second issue raised by Defendant's motion for summary judgment is whether Plaintiffs' negligence claims are barred by an exculpatory release provision contained on Blue Mountain Resort lift tickets. Under Pennsylvania law, the validity of an exculpatory clause is governed by several principles: (1) The release or contract must not contain any policy of the law; (2) it must be an agreement between individuals relating to their private affairs; and (3)

each party to the agreement must be a free bargaining agent, not one drawn into an adhesion contract with no recourse but to reject the entire transaction. *Zimmer v. Mitchell and Ness*, 385 A.2d 437, 439 (Pa. Super. Ct. 1978). Importantly, the burden of establishing immunity is upon the party invoking protection under the exculpatory clause. *Chepkevich*, 2 A.3d at 1189 (citing *Dilks v. Flohr Chevrolet*, 192 A.2d 682, 687 (Pa. 1963)).

Before delving deeper into the standards in Pennsylvania for interpreting exculpatory clauses and discerning their validity and enforceability, Defendant obviously must show in the first instance that there was a valid contract between the parties containing the exculpatory clause. To do so, Defendant avers that "[a]s a condition of going onto the ski lifts, Plaintiff accepted and agreed to an exculpatory release contained on his lift ticket[.]" (Doc. 40, ¶13). In support, Defendant cites Mr. Mattei's deposition testimony in which he admitted "to pass through the lift gates, [he] would have had to have had a lift ticket," and he would have had to pass through the gates at Blue Mountain Resort to ski on the date of the incident; however, Mr. Mattei does not recall receiving or reading a lift ticket on the date of the incident. (Doc. 40 at 29–30, Mr. Mattei Deposition). Defendant also attaches as an exhibit a copy of a lift ticket with an exculpatory clause, apparently

representing that it was the lift ticket Mr. Mattei received or identical to the ticket he received on the day of the incident.

On this record, Defendant has not met its initial burden of production as the moving party to show Plaintiffs' negligence claims are barred by the purported exculpatory release on the back of the lift ticket. *See Bressman*, 27 F.3d at 238 (moving party "must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party") (internal citations omitted); *Chepkevich*, 2 A.3d at 1189 (burden of establishing immunity under exculpatory release is on the party invoking its protection). Mr. Mattei's acknowledgement in his deposition that he presumably would have had to obtain a lift ticket to ski at the resort that day is not enough to demand an inference that he did receive a lift ticket, let alone the copy of a lift ticket attached as an exhibit to Defendant's motion. Moreover, even if the court were to draw an inference that Plaintiff did receive and accept a lift ticket the day of the incident, the cases cited by Defendant do not support summary judgment in its favor on account of the exculpatory release.

The first case relied on by Defendant is *Savarese v. Camelback Ski Corp.*, 417 F.Supp.2d 663, 667 (M.D. Pa. 2005), in which the court held, "In this case, the lift ticket purchased under these circumstances, viz the clear

language next to the window and the clear language on the lift ticket, places the lift ticket on the level of being a valid exculpatory agreement[.]" Here, there is no evidence of a notice of release on the ticket window at Blue Mountain Resort comparable to the one purportedly adorning the lift ticket Mr. Mattei received. The court in *Saverese* explained the window notice "does provide Plaintiff with repetitive notice of the fact that skiing, 'including the use of the lifts, is a dangerous sport,' and it repeats the condition that the purchase of a lift ticket releases Defendant, even if negligent, and warns not to purchase a lift ticket unless the purchaser agrees to the release and to be bound by the language on the lift ticket." *Id.* Without any evidence of a repetitive notice of the release provision on the lift ticket Mr. Mattei purportedly purchased, Defendant's reliance *Saverese* is unavailing.

Defendant also relies on *Seaton v. E. Windsor Speedway, Inc.*, 582 A.2d 1380, 1383 (Pa. Super. Ct. 1990), for the proposition that "a releasor cannot avoid the effect of a release on the grounds that he did not read it or know its contents." (Doc. 39 at 13). Fair enough; but summary judgment was proper in *Seaton*, in part, because the plaintiff admitted he received and signed the release at issue. Here, there is a mere inference Mr. Mattei received the release, and Defendant does not even allege Mr. Mattei signed it. *See Lin v. Spring Mountain Adventures, Inc.*, No. CIV.A. 10-333, 2010 WL

5257648, at *5 (E.D. Pa. Dec. 23, 2010) (release valid because plaintiff was a voluntary signatory to a full-sized contract); *Chepkevich*, 2 A.3d at 1192 (release held valid when skier signed release from liability before chairlift incident); *Saverese*, 417 F.Supp.2d at 665 (release held valid when skier had also signed an equipment rental agreement that included a clear release provision). Accordingly, Defendant has not demonstrated that summary judgment in its favor on Plaintiffs' negligence claims is appropriate by virtue of the purported exculpatory release.

**C. Gross Negligence and Recklessness**

The last issue raised by Defendant's motion for summary judgment is whether Plaintiffs' record evidence is sufficient to raise a genuine issue of material fact as to their claims for gross negligence and recklessness. According to Defendant, "the record in this case is devoid of any evidence of negligence, let along gross negligence or reckless conduct, and Plaintiff's claims should be dismissed as a matter of law." (Doc. 39 at 16). The court again applies Pennsylvania law to these Pennsylvania state law claims.

Under Pennsylvania law, "there is a substantive difference between 'ordinary negligence' and 'gross negligence,'" and "[t]he general consensus finds gross negligence constitutes conduct more egregious than ordinary negligence but does not rise to the level of intentional indifference to the

consequences of one's acts." *Kozlowski*, 427 F.Supp.3d at 569 (citing *Kibler*, 184 A.3d at 984). "Gross negligence may be deemed to be a lack of slight diligence or care compromising a conscious, voluntary act or omission in 'reckless disregard' of a legal duty and the consequences to another party." *Id.* Similarly, "recklessness requires a conscious action or inaction which creates a substantial risk of harm to others." *Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1200 (Pa. 2012). "Gross negligence is generally a question of fact for the jury to decide," *Cohen v. Kids Peace Nat. Centers, Inc.*, 256 F. App'x 490, 492 (3d Cir. 2007); however, "a court may decide the issue as a matter of law where the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence," *id.* (citing *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164–65 (1997)).

This case is not "entirely free from doubt." *Id.* Rather, summary judgment is inappropriate on this record because Plaintiffs have produced evidence raising a genuine issue of material fact regarding Defendant's alleged conscious disregard of the risk of harm posed by the alleged five-foot ditch on the ski trail. Plaintiffs' expert identified in his report that it was open and obvious that ski patrons at Blue Mountain Resort skied in the area of the ditch based on multiple ski tracks shown in photos of the relevant area.

(Doc. 41, ¶26). Moreover, Blue Mountain Resort's Risk Manager testified in a deposition that he was okay with people skiing in the area with the ditch where Mr. Mattei fell. (Doc. 41, ¶27). Moreover, it is undisputed that the resort made no effort to mark or warn patrons about the risk of the ditch, such as ribbons or signs that say "closed" and the like. Assuming the ditch was concealed from the downhill skier's vantage point—a fact of which the court found above that Plaintiffs have raised a genuine dispute—a rational jury could find Defendant acted with gross negligence or recklessness in conscious disregard of the risk of harm. As such, the governing summary judgment standards do not permit the court to take this dispute out of the jury's hands.

IV. **C**ONCLUSION

In light of the foregoing genuine disputes of material fact, the court will **DENY** Defendant's motion for summary judgment. An appropriate order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
United States District Judge

**DATE: February 28, 2023**
19-2196-01